J-S55043-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE MATTER OF: ADOPTION OF: M.L.K.. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.S.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 695 WDA 2020 |

Appeal from the Decree Dated June 12, 2020
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  2020-209 IVT

BEFORE:   BOWES, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    FILED DECEMBER 29, 2020

N.S.K. ("Mother") appeals from the decree dated and entered June 12, 2020, granting the petition, filed by Cambria County Children and Youth Service ("CYS" or the "Agency"), seeking to involuntarily terminate Mother's parental rights to M.L.K. ("Child") (born in June of 2017), her minor, female child with J.S. ("Father"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1]  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court involuntarily terminated the parental rights of Mother and Father (collectively, the "Parents"), on the same date.  Father has not appealed the termination of his parental rights, nor has he filed a brief in this appeal.

On February 26, 2020, CYS filed the petition to involuntarily terminate Mother's and Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  On March 17, 2020, the trial court appointed Attorney Suzann Lehmier as Child's guardian ad litem and legal interests counsel ("GAL/Counsel").[2]  On May 14, the trial court appointed attorney Sydney Maurer to represent Mother.   Father proceeded pro se.

_____

[2] In In re Adoption of L.B.M., 639 Pa. 428, 161 A.3d 172 (2017) (plurality), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires the appointment of counsel to represent the legal interests of any child involved in a contested involuntary termination proceeding.  The Court defined a child's legal interests as synonymous with his or her preferred outcome.  In In re T.S., 648 Pa. 236, 192 A.3d 1080 (2018) (filed August 22, 2018), the Supreme Court held that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome.  The Court explained, "if the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings."  Id. at 257, 192 A.3d at 1092-1093.

Here, Child was almost three years old at the time of the hearing.  The trial court determined there was no conflict between Child's legal interests and best interest.  See Trial Court Opinion, 6/12/20, at 1-2.  We do not comment on the quality of the GAL/Counsel's representation of Child.  See In re: Adoption of K.M.G., 219 A.3d 662, 669 (Pa. Super. 2019) (en banc) (filed September 13, 2019) (holding that this Court has authority only to raise sua sponte the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation) (affirmed, ____ A.3d____ (Pa., filed November 10, 2020).

The trial court set forth the following factual background and procedural history of this appeal.

3. CYS started services in December of 2017 for the following reasons:

A. [Mother] was then 16 years old and a dependency petition had been filed in the interest of [Mother] on that date.

B. [Mother] refused to take her prescribed mental health medication.

C. [Mother] refused to meet with and cooperate with the potential service providers.

D. [Mother] was relying upon her caregivers (her great-grandfather and her mother) to provide basic care for the child, refusing to take the initiative to do such basic tasks as feeding the baby or changing her diaper.

E. The bond between [Mother] and the child appeared to be weak and [Mother] appeared content to have others care for the child.

F. [Mother] had allowed inappropriate individuals to be around the child.

G. There were reports that during visits with the child[, Mother] spoke on the phone with others while others cared for the child.

H. [Father] lived in Florida and CYS had attempted to make contact with him without success (Petitioner's Exhibit 5).

4. Pursuant to a petition averring dependency, the Juvenile Court held a hearing on January 29, 2018 and issued an order that same date finding the child to be dependent, placing the child and her biological mother, a minor, in foster care together in the same home. The placement goal was return child to parent. [Mother] was ordered to actively participate, regularly attend, and successfully complete parenting skills classes and demonstrate her understanding of the skills and recommendations learned in

the parenting classes by using them within the home, and she was to fully cooperate with Teen Parenting, Justice Works Nurturing Parent, Nulton Diagnostic Family Based, and Northwestern Human Services. [Father] was, and remained, in Florida and had no contact with the child.

5. Dennis Kashurba, a licensed psychologist, evaluated [Mother] on February 19, 2018. The purpose of the evaluation was to gather information pertinent to ascertaining what types of services would be appropriate to facilitate the possible reunification of [Mother] with her infant daughter (at that time eight months old). After reviewing [Mother's] records, Mr. Kashurba noted in his report that:

"In mid-December 2017, [Mother] refused to take the medication she was prescribed at Nulton Diagnostic. She was subsequently discharged unsuccessfully from Nulton Diagnostic. She reportedly had prior trials of antidepressant medication. Her history is also significant for engaging in self-mutilation in the form of cutting her left wrist and forearm. Numerous superficial scars were observed during the course of the evaluation today. As a result of these concerns, the custodial grandfather was described at [sic] being at his "wits end" with [Mother]. This led to his indicating he can no longer control her since she engaged in tantrum behavior and would sometimes become physically aggressive to those in the home. Of additional concern was the interaction and the bond between [Mother] and [Child], which was described as being "very minimal" and typically lasted only for short durations. [Mother's] tantrum behaviors reportedly occurred whenever she was not permitted go to her friend's house or was requested to do something of a responsible nature or to refrain from engaging in some activity.

[Mother] has been the recipient of numerous interventions, including the aforementioned medication management at Nulton Diagnostic, as well as Family Based services through Nulton Diagnostic. However, CYS records indicate that it was the opinion of the Family[-]Based service providers that the mother and the child both need to be placed. Additionally, [Mother] has received services from Nurse Family Partnership and Justice Works Nurturing

- 4 -

Parent Program. Both of these have documented that [Mother] rarely cares for the needs of [Child] and often hands the child over to others to care for her needs."

Mr. Kashurba administered several standardized tests to [Mother]. She has an IQ of 77. Her scores on the standardized tests showed that she had a normal 9- to 10-year-old development and within the upper half of the borderline range. On the Parent Behavior rating scale, the foster mother rated [Mother] as being significant across all six of the measurements of that instrument. In his conclusion, Mr. Kashurba opines that "the total information available at the present time indicates that [Mother's] cognitive and academic deficiencies make the prognosis poor for her learning and independently implementing appropriate parenting strategies to guarantee the best interests of her daughter."

Mr. Kashurba's diagnostic impressions list Parent/Child Relational Problem, Relational Problem NOS [Not Otherwise Specified], Unspecified Disruptive Impulse Control Disorder, High Expressed Emotional Level within Family, Borderline Intellectual Functioning, Borderline Personality Traits with Dependent Features (Petitioner's Exhibit 8).

6. The Juvenile Court conducted a Permanency Review Hearing on July 25, 2018 and issued its order on August 7, 2018[,] determining that [Mother] had been only minimally compliant with the Permanency Plan in that she had not been able to demonstrate that she was able to independently manage her mental health or maintain her mental health. Further, she had not been able to demonstrate that she is learning and maintaining parenting skills. She had made minimal progress towards alleviating the circumstances which necessitated the original placement.

. . . The goal remained return to parent with a concurrent placement plan of adoption.

7. A Permanency Review Hearing was held on December 19, 2018, with the Juvenile Court's order entered on January 2, 2019. Again, the [trial court] found that [Mother] had only minimal compliance with the Permanency Plan, and had made only minimal progress towards alleviating the circumstances which necessitated the original placement. . . . The current placement goal was to

return the child to parent. The concurrent placement plan for the child was adoption.

8. Another Permanency Review Hearing was held on June 10, 2019, with the Juvenile Court's order entered on June 19, 2019. The [trial court] noted that the child appeared to be happy in her foster home and was bonded to her foster family. Further, [the court noted] that she was too young to share her views in any coherent way. This time the [trial court] found that [Mother] made moderate compliance with the Permanency Plan and that she now attends visits with her daughter, but still struggles to effectively care for her. The [trial court] also found moderate progress towards alleviating the circumstances which necessitated the original placement as to [Mother].

. . . The child had now been in placement for 17 months. The [trial court] determined that [Mother] should continue to be compliant with her mental health treatment at Nulton Diagnostic and to continue to actively participate, regularly attend, and successfully complete the parenting skills classes.

9. Mr. Kashurba again evaluated [Mother] on September 23, 2019. After noting [Mother's] prior treatment at Nulton Diagnostic and prior diagnoses, he noted a reference to [Mother's] having experienced possible dissociative episodes, as well as claiming a 29-year-old alter ego named Sally was responsible for rough treating of her daughter while in [Mother's] care. Of particular note is the April 24, 2018 comment by her treating psychiatrist at Nulton Diagnostic that she "continues to seemingly dissociate at times, bordering on psychosis." The psychiatrist also noted that she had "significant concerns about her safety around the infant and the foster mother confirmed she is doing all of the direct care."

[Mother] was given the Basic Personality Inventory, Parenting Stress Index, and Aggression Questionnaire. There were no significant elevations on the Parenting Stress Index, nor the Aggression Questionnaire. However, two areas on the Personality Inventory showed significant elevation: Denial and Thinking Disorder. Mr. Kashurba noted that this area of elevation tends to be consistent with some of the aforementioned concerns from her prior mental health treatment. He noted in his conclusion that [Mother] has adequate intellectual ability to learn appropriate parenting strategies to ensure the best interests of

the child, and at that time appeared to be free of any major affective spectrum disorder symptomology that had been the case prior to her resuming psychiatric treatment. He goes on to state:

> "Thus, this would seem to be the optimal opportunity for providing [Mother] with the types of services that will give her the best opportunity to demonstrate her ability to function at some time in the future as a primary figure for her daughter" (Petitioner's Exhibit 9).

* * *

11. The last Permanency Review Hearing was held on November 27, 2019, with an order entered on December 18, 2019. The Juvenile Court found that the parents had made only minimal progress with the Permanency Plan and that neither consistently attend[ed] visits nor followed through with the services provided. . . . The placement goal was changed to adoption. The child had now been in placement for 22 months. The [trial court] further found that CYS had made reasonable efforts to finalize the Permanency Plan in effect for this child[,] and that CYS need not make any further reasonable efforts to return the child to her parents. The Juvenile Court found that reunification of the child with her parents was not an appropriate option[,] as it would not be in the child's best interest to make further attempts at reunification.

12. Services rendered to the parents, primarily to [Mother], as [Father] was for most of this time in Florida, include:

* CYS caseworker services;

* Nulton Diagnostic medication management and counseling;

* Merakey Family Finding and Engagement;

* Justice Works Nurturing Parenting;

* Merakey foster care;

* Psychological evaluations by Dennis Kashurba; 3).

* Johnstown Christian Home independent living;

* The Meadows psychiatric hospitalization;

* CYS Social Work Services (Petitioner's Exhibit 3).

Trial Court Opinion, 6/12/20, at 2-11.

On June 1, 2020 and June 3, 2020, the trial court held evidentiary hearings on the petition. At the hearing on June 1, 2020, CYS presented the testimony of Kathy Pitman, CYS social worker; Dennis Kashurba, a psychologist who testified as a stipulated expert in psychology and who performed psychological evaluations of the Parents; Brooke Schreyer, the program director for JusticeWorks Youth Care; Jessica Mills, a CYS social worker; and Dorothy Wyatt, who is employed by Christian Home of Johnstown and worked with Mother on everyday living skills. N.T., 6/1/20, at 5, 46-48, 81-82, 99-100, and 115. Father testified on his own behalf, questioned by the trial court on direct examination. Id. at 123. Mother testified on her own behalf. Id. at 146.

At the hearing on June 1, 2020, CYS social worker, Ms. Pitman, testified that Mother: has been unable or unwilling to rectify any of her mental health needs and adequately be trained in her parenting abilities; does not have housing for herself; has been unable to care for herself, although she has become an adult; and has no plan. N.T., 6/1/20, at 29. Ms. Pitman believed that the severance of any bond between Mother and Child would not detrimentally impact Child. Id. at 29-30. In fact, Ms. Pitman testified that severing any bond between Child and Mother would promote Child's

developmental, physical and emotional needs, because Child would have consistency in her life and her pre-adoptive foster family would meet those needs. Id. at 30. Ms. Pitman testified that Child will have the ability to bond with her pre-adoptive foster family in the future, as she had been placed with them for more than two years, and she is currently bonded with the family. Id.

CYS's expert psychologist, Mr. Kashurba, testified that Mother has adequate intellectual ability to learn appropriate parenting strategies. Id. at 67. He stated that Mother appeared to be free from any major affective spectrum symptomatology that had been the case prior to her resuming psychiatric treatment. Id. Mr. Kashurba further testified that Mother's emotion and behavior appear to have stabilized considerably since she resumed psychiatric treatment and since Father had returned to Pennsylvania after living in Florida for a few years. Id. Mr. Kashurba testified that there is an optimal opportunity to provide Mother with services that would give her the best opportunity to demonstrate her ability to function at some point in the future as the primary caregiver for Child. Id. Mr. Kashurba stated that Mother does not appear to have any drug/alcohol use disorder that would adversely affect her ability to benefit from the services provided to her. Id. Mr. Kashurba testified that Mother had a diagnostic impression of parent-child relational problem, borderline intellectual functioning, and borderline personality traits. Id. Mother also had a diagnosis, by history of treatment

at Nulton Diagnostic, of major depressive order, generalized anxiety, and post-traumatic stress disorder. Id. at 67-68. Mr. Kashurba recommended Mother should be treated with medication and psychotherapy. Id. Since Mother has borderline personality features and traits, he also recommended that Mother should have social skills training. Id. at 68. Further, Mr. Kashurba recommended that Mother should have intensive outpatient services including both individual and group therapy on a weekly basis in addition to the medication. Id. at 69.

On cross-examination by Mother's counsel, Mr. Kashurba testified that, when he first evaluated Mother on February 19, 2018, he observed Mother interact with Child, and that they seemed to be affectionate and to share a bond. Id. at 77. Mr. Kashurba deferred to the personnel who conducted the parenting training classes with regard to Mother's ability to parent Child, and whether her ability had improved with training, over time. Id. at 75, 78.

JusticeWorks Youth Care program director, Ms. Schreyer, testified that she worked with Mother and provided family services to her, consisting of working on parenting, primarily in the goal areas of building a bond with Child, learning different parenting skills, and having appropriate interactions and observations, with the assistance of visit coaching. Id. at 82-84. Ms. Schreyer testified that, when Mother completed the services, Ms. Schreyer would not have been comfortable leaving Mother with Child if someone were not there to prompt Mother. Id. at 88-89. Ms. Schreyer testified that Mother

and Child have a strong bond when they are together for the visitation, but she is familiar with reports that Mother often misses her phone contact with Child. Id. at 89. Ms. Schreyer has observed Child with her foster family, and finds that they meet Child's needs and that Child is bonded with them. Id.

Ms. Schreyer opined that the termination of Mother's parental rights is in Child's best interests. Id. at 89-90. Ms. Schreyer opined that, when she worked with Mother, there were still areas that remained for Mother to address and work on before Mother could multi-task and have full-day visits with Child, let alone safely and successfully parent Child on her own. Id. at 90.

CYS social worker, Ms. Mills, testified that Parents had goals of increasing parenting skills; obtaining housing; and improving decision-making skills. Id. at 100. Prior to the goal change hearing, Ms. Mills scheduled sixteen supervised visits and fourteen social work sessions with Mother, but Mother attended only eleven visits and eight social work sessions. Id. Ms. Mills utilized the parent-child interaction model known as the "Safe Care Program". Id. at 101. This module has a goal of learning basic hands-on parenting skills to increase positive interactions with Child and increase Parents' bond with Child by teaching new ways to help Child learn, grow, and develop. Id. at 101-102. Mother was able to provide basic hands-on parenting, such as changing Child's diaper and comforting Child when she was crying, but she had difficulty in decision-making for Child's daily activities, such as planning ahead. Id. at 102. Mother also had difficulty focusing on

Child for an extended period of time, such as following Child to Child's next activity. Id. at 102-103.

Ms. Mills stated that the level of parenting ability that Mother demonstrated while she worked with Mother did not reflect the level of parenting ability Ms. Mills would have expected, given Mother's prior parenting training. Id. at 103. Ms. Mills testified that Mother appeared to have the ability to use basic hands-on parenting skills and was able to comfort Child when Child was crying, and there appeared to be a bond between Child and Mother; however, ongoing extensive parenting was difficult for Mother, as she had difficulty in focusing on Child. Id. at 104. Ms. Mills testified that Child would not be safe in Mother's care, because Mother would have difficulty caring for Child on an extended basis and required prompting from Ms. Mills in caring for Child during the two-hour visits. Id. at 104-105. Mother did not bring the necessary materials with her when she attended the visits. Id. at 105. Mother had difficulty retaining the skills she learned from week-to-week, as well as difficulty answering open-ended questions regarding why particular skills were important. Id.

Ms. Mills testified that Mother did not have the level of ability to make progress in a reasonable amount of time, given her extensive training prior to working with Ms. Mills and her lack of motivation to show up to visits and to practice her skills while working with Ms. Mills. Id. at 106-107. Although Ms. Mills noted that Mother and Child are bonded to some degree, she opined that

the termination of Mother's parental rights was in Child's best interests and that Child would not be emotionally harmed. Id. at 107.

Next, Dorothy Wyatt, of Christian Home of Johnstown, testified regarding her work with Mother in the independent living program. Id. at 115. Ms. Wyatt stated that, in particular, she focused with Mother on possibly pursuing post-secondary education and securing housing. Id. at 115-116. Ms. Wyatt testified that, while Mother was in foster care, Ms. Wyatt met with her twice a month, but, when Mother was no longer in foster care, she met with Mother only once a month. Id. at 116. During the entire time while Ms. Wyatt met with Mother, Mother did not obtain a job or housing, and Mother did not establish that she could parent a child. Id. at 117-118. Mother only showed an interest in working with Ms. Wyatt in August and September of 2019, and, after that date, Ms. Wyatt did not have any more contact with Mother, despite her attempts to continue to work with Mother. Id. at 117-120.

At the hearing on June 3, 2020, the trial court heard the remainder of Mother's testimony. During her testimony, Mother raised serious allegations regarding an adult male. Id. at 29-39. CYS then presented the testimony of Melissa Raho, the CYS social work supervisor, concerning what CYS would do to address and investigate Mother's allegations which, to her knowledge, Mother was raising for the first time. N.T., 6/3/20, at 39-41. Ms. Raho stated that CYS would investigate the allegations per its protocol. Id. Mother's

counsel requested the trial court take her allegations into consideration and stay its decision on the petition until an investigation was concluded. Id. at 42-43. At the close of the hearing, the GAL/Legal Counsel recommended that the Parents' paternal rights to the almost three-year-old Child should be terminated so that Child may be adopted by her foster family, with whom she has lived for almost two and a half years and is bonded, and have permanency and stability in her life. Id. at 47-49. The GAL/Legal Counsel stated that the termination of Mother's parental rights would not be detrimental to Child's emotional welfare. Id. The court declined Mother's request to stay the proceedings, and asked counsel to keep it apprised of any developments. Id. at 49.

In the decree entered on June 12, 2020, the trial court terminated the Parents' parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (a)(2), (5), (8), and (b). On July 10, 2020, Mother filed a notice of appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In her brief, Mother raises the following issues:

A. Whether the [t]rial [c]ourt erred as a matter of law and/or manifestly abused its discretion in determining the Agency sustained its burden of proving the termination of Natural Mother, N.S.K.'s, parental rights is warranted under Sections 2511(a)(1), 2511(a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act?

B. Whether the [t]rial [c]ourt erred as a matter of law or abused its discretion by terminating the natural mother's rights before the completion of an investigation into an allegation which was

- 14 -

revealed during the hearing and which directly relates to the reason the natural mother and child were initially separated?

Mother's Brief, at 7.

In her brief, Mother argues:

[T]he Agency failed to establish the statutory factors necessary to terminate her parental rights pursuant to Sections 2511(a)(1), 2511(a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act by clear and convincing evidence. Even in the event this Court were to conclude the Agency established grounds for the termination of Mother's parental rights pursuant to the Adoption Act, Mother argues the [t]rial [c]ourt nevertheless erred in concluding the best interests of the Child would be served by terminating her parental rights.

Mother also argues the [t]rial [c]ourt erred as a matter of law or abused its discretion by terminating Mother's parental rights before the completion of an investigation into an allegation which was revealed during the hearing and which directly relates to the reason the natural mother and child were initially separated.

Mother requests that the [t]rial [c]ourt's decision terminating her parental rights be reversed and, upon the conclusion of the investigation by Agency of the allegation made by the [m]other, the record be updated.

Mother's Brief, at 11, 14.

Mother challenges the trial court's conclusion with regard to section

2511(b), stating:

Even in the event this Court were to conclude the Agency established one (1) or more statutory grounds to support the termination of Mother's parental rights, the Agency failed to demonstrate the best interests of the [c]hild would be served by terminating Mother's parental rights at this time. In the instant case, the [C]ourt should be guided by the fact that there was not any evidence presented which disputes the fact that the [c]hild has a bond with the [m]other. Mother is pregnant with another

child and she desires to be reunified with the [c]hild [M.L.K.] and maintain a family bond.

The [m]other has experienced many issues which have impeded her efforts at reunification. However, Mother has stable housing and her mental health has improved, all of which were the primary reasons which lead [sic] to the [c]hild being removed. When Mother has been able to attend visits with the child, she was attentive to her needs and tended to her needs. Agency witness, Jessica Mills, testified that Mother exhibited basic hands-on parenting skills (T. 104). There was no testimony offered to dispute the bond that the [c]hild has with Mother. To the contrary, several of Agency witnesses testified that there is a bond between Mother and Child. The Agency failed to meet its burden to establish that Mother does not have a bond with the [c]hild. Furthermore, the [t]rial [c]ourt failed to fully consider the effect terminating Mother's parental rights will have on the emotional needs and welfare of the [c]hild pursuant to Section 2511(b). Accordingly, even if this Court concludes the Agency established one or more statutory grounds terminating Mother's parental rights, the [t]rial [c]ourt nevertheless erred in concluding the termination of Mother's rights serves the needs and welfare of the [c]hild. Mother contends that it is in the [c]hild's best interest to be reunified with Mother and to establish a relationship with her sibling.

Id. at 22-23.[3]

Moreover, with regard to the second issue in her brief, Mother asserts that, in her testimony on June 3, 2020, she raised serious allegations involving

_____

[3] We find the issue regarding section 2511(b) discussed in Mother's brief was not subsumed into the first issue in her concise statement and statement of questions involved, which specified CYS's failure to sustain its burden of proof with regard to section 2511(a)(1), (2), (5), and (8). Thus, Mother waived any challenge to section 2511(b) for our review. See Krebs v. United Refining Co., 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); see also In re W.H., 25 A.3d 330, 339 n.3 (Pa. Super. 2011); see also In re M.Z.T.M.W., 163 A.3d 462, 465-66 (Pa. Super. 2017).

an adult male. Mother claims these allegations are the basis for her emotional outbursts and her subsequent admission into a psychiatric facility and separation from Child. Mother states that she reported the incident to a social worker, Kristin Caro, but the Agency's witness, Melissa Raho, testified that she was never made aware of the allegations. Mother's Brief, at 24 (citing N.T., 6/3/20, at 40).

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. In re: R.J.T., 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. Id.; R.I.S., [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Id.; see also Samuel Bassett v. Kia Motors America, Inc., 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); Christianson v. Ely, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. Id.
>
> As we discussed in R.J.T., there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. R.J.T., [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and

termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. In re Adoption of Atencio, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

In re Adoption of S.P., 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove, by clear and convincing evidence, that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" Id. (quoting In re J.L.C., 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's termination of parental rights if any one subsection of section 2511(a) has been satisfied. See In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). Here, we focus on section 2511(a)(2) and (b), which provides:

§ 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary

for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. See In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. In re A.L.D. 797 A.2d 326, 337 (Pa. Super. 2002).

This Court has stated "once the statutory grounds for termination have been met under [s]ection 2511(a), the [trial] court must consider whether termination serves the needs and welfare of the child, pursuant to [s]ection 2511(b)."  See In re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super. 2008) (en banc).[4]  The focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). Id.  In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S. § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012).  In In re E.M., [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.  In re K.M., 53 A.3d at 791.

In re: T.S.M., 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013).

When evaluating a parental bond, "the court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well.  Additionally, section 2511(b) does not require a formal bonding

_____

[4] Although Mother waived any challenge to the termination of her parental rights under section 2511(b), as part of our two-tiered analysis, we will, nevertheless, discuss the termination under that section to demonstrate that, even if Mother had not waived any challenge, CYS satisfied its requirements.

evaluation." In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." In re K.Z.S., 946 A.2d 753, 762 (Pa. Super. 2008).

Here, the trial court addressed both of Mother's issues together, as follows:

13. A representative of Justice Works Youth Care[, Ms. Schreyer,] testified concerning a Justice Works report for services rendered in 2019. Justice Works began providing services in December of 2018. In their report, the referral listed multiple goal areas for [Mother] all involving around the concern that [Mother] was refusing to parent [Child].

"It has also been shared that [Mother] had once again stopped taking medication, was not attending school, would not allow any suggestions on parenting, and often left home without [Child] to go see friends sometimes for days."

[Mother] was able to accomplish various goals. At times she would be able to provide a safe, productive visit with the child without prompting. Other times she would need assistance with being able to fully parent the child. Multitasking proved to be very difficult for [Mother]. [Mother's] mental health was a noted area of concern during the review period, as it was believed to progressively decline. There were various times where [Mother] was encouraged to explore a deeper level of commitment to her mental health sessions, as she had shown continuing signs of her mental health deteriorating. When asked if she felt she was experiencing similar signs of depression or other diagnoses, she would disclose that "she felt fine" (Petitioner's Exhibit 10).

14. CYS had provided services through one of its social workers[, Ms. Mills,] through a training curriculum called "Safe Care." In

her report to the [trial court] (Petitioner's Exhibit 11), the worker noted that both [Father] and [Mother] were often unprepared for their sessions as they frequently did not bring their Safe Care binders and frequently verbalized that they had not participated in the skills they were to be learning between sessions. . . . The report notes that [Mother] appeared to have significant cognitive limitations such as diminished memory, delayed mental processing, and difficulty problem-solving. The social worker was in agreement with CYS' recommendation of goal change to adoption.

15. Services were also provided to [Mother] and [Father] through the Independent Living Program overseen by The Christian Home of Johnstown, Inc.[, Ms. Wyatt]. Of special note is a comment in the report December 2019 through January 2020, which says:

> "Client made no contact with Case Manager for the month of January. Case Manager attempted to attend Client's visit with minor child to sign paperwork and give stipends to the client, but the social worker informed the Case Manager that the Client canceled and was moving to Florida" (Petitioner's Exhibit 12).

16. The [trial court] feels sorry for this young couple. They, as many of the parents who find themselves in involuntary termination court proceedings, never had a chance, then[,] when given an opportunity through CYS services[,] they are unable to take advantage of those services. They love their child, but cannot provide for the child. [Mother] testified to serious allegations concerning an adult male. The [trial court] has been assured that the allegations are being checked out by CYS. Notwithstanding those allegations, the fact remains that the child has not been in the custody of [Mother] since the child was eight months old. . . . [Mother] has no job, no independent living, and cannot be left alone with the child. . . .

17. In the [trial court's] opinion, this child needs support and affection and an opportunity to flourish. She is doing well in foster care.

18. [CYS] has established a legal basis for terminating the parental rights of . . . [Parents].

\* \* \*

20. There is conflicting testimony as to a bond between [Mother] and her child. . . . Even though there is some type of a bond between [Mother] and her child, there is testimony that severing that bond will not have a detrimental effect on the child.

21. In terminating the parental rights of these [p]arents, this [c]ourt has found this will best meet the developmental, physical, and emotional needs and welfare of the child.

* * *

Trial Court Opinion, 6/12/20, at 11-15.

After a careful review of the record, this Court finds the trial court's decision to terminate the parental rights of Mother under section 2511(a)(2) and (b) is supported by competent, clear and convincing evidence in the record. In re Adoption of S.P., 616 Pa. at 325-326, 47 A.3d at 826-827. In so finding, we have carefully reviewed the testimony of Ms. Pitman, Ms. Schreyer, Ms. Mills, and Ms. Wyatt, as well as Mr. Kashurba, as set forth above. There was competent evidence in the record from which the trial court could have concluded that CYS proved, by clear and convincing evidence, that Mother demonstrated: (1) repeated and continued incapacity, abuse, neglect or refusal to parent; (2) such incapacity, abuse, neglect or refusal caused Child to be without essential parental care, control or subsistence necessary for her physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. See In re Adoption of M.E.P., 825 A.2d at 1272.

Moreover, although there was conflicting testimony regarding the existence of a bond between Child and Mother, as noted by the trial court, the

trial court did not abuse its discretion or commit an error of law in determining that the severance of any bond that existed would further Child's developmental, physical, and emotional needs and welfare, and, thus, would further Child's best interests, and would not be detrimental to Child. Our Supreme Court has stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." See In re: T.S.M., 620 Pa. at 627, 71 A.3d at 267 (quoting In re K.K.R.-S., 958 A.2d 529, 535 (Pa. Super. 2008)). The Supreme Court stated, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding.") See In re: T.S.M., 620 Pa. at 629, 71 A.3d at 267 (quoting In re Involuntary Termination of C.W.S.M., 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting)). Thus, had Mother preserved a challenge to section 2511(b), we would find that the trial court properly ruled that CYS met its burden with regard to section 2511(b). In re: T.S.M., 620 Pa. at 628-629, 71 A.3d at 267.

Finally, Mother's allegations of abuse by an adult male, made, for the first time, to the knowledge of CYS witness Ms. Raho, during the testimony at the second day of the hearing on the termination petition, was to be afforded due consideration by the trial court, and considered, if the CYS investigation

bore out that Mother's allegations had merit. We find that the trial court did not commit an abuse of discretion or an error of law in terminating Mother's parental rights despite CYS's opening of an investigation into Mother's new allegations, especially since there has been no showing that the allegations were founded.

While Mother may claim to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010). We stated in In re Z.P., a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." Id. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa. Super. 2004). Accordingly, we affirm the trial court decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/29/2020

- 25 -